**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

JUAN FELIPE RECENDEZ,                    ) Case No. EDCV 13-2003-JPR
                                          )
                    Plaintiff,            )
                                          )
          vs.                             ) **MEMORANDUM OPINION AND ORDER**
                                          ) **AFFIRMING THE COMMISSIONER**
                                          )
CAROLYN W. COLVIN,                        )
Acting Commissioner of                    )
Social Security,                          )
                                          )
                    Defendant.            )
                                          )
_____ )

**I.    PROCEEDINGS**

     Plaintiff seeks review of the Commissioner's final decision
denying his application for Social Security disability insurance
benefits ("DIB") and supplemental security income benefits
("SSI").  The parties consented to the jurisdiction of the
undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c).  This
matter is before the Court on the parties' Joint Stipulation,
filed August 22, 2014, which the Court has taken under submission
without oral argument.  For the reasons discussed below, the
Commissioner's decision is affirmed and judgment is entered in
her favor.

1

## II.   BACKGROUND

Plaintiff was born on October 27, 1965.  (Administrative Record ("AR") 219, 223.)  He completed sixth grade, spoke limited English, and worked as a plaster laborer, roofer, and dishwasher in a restaurant.  (AR 44, 54-55, 247, 259-62.)

On September 29, 2011, Plaintiff filed applications for DIB and SSI, alleging that he had been unable to work since September 26, 2009.  (AR 113-14, 219-32.)  In a disability report, he alleged that he was unable to work because of "[b]roken arm, disc, neck, hip, rib problem." (AR 247.)  After Plaintiff's applications were denied initially and on reconsideration, he requested a hearing before an Administrative Law Judge.  (AR 133-34.)

A hearing was held on May 24, 2013.  (AR 39-59.)  Plaintiff, who was represented by counsel, testified, as did a vocational expert.  (Id.)  In a written decision issued June 7, 2013, the ALJ determined that Plaintiff was not disabled.  (AR 25-34.)  On July 23, 2013, Plaintiff requested Appeals Council review. (AR 15.)  On September 4, 2013, the council denied the request. (AR 1-5.)  This action followed.

## III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept

as adequate to support a conclusion.  <u>Richardson</u>, 402 U.S. at

401; <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1035 (9th Cir. 2007).

It is more than a scintilla but less than a preponderance.

<u>Lingenfelter</u>, 504 F.3d at 1035.  To determine whether substantial

evidence supports a finding, the reviewing court "must review the

administrative record as a whole, weighing both the evidence that

supports and the evidence that detracts from the Commissioner's

conclusion."  <u>Reddick v. Chater</u>, 157 F.3d 715, 720 (9th Cir.

1996).  "If the evidence can reasonably support either affirming

or reversing," the reviewing court "may not substitute its

judgment" for that of the Commissioner.  <u>Id.</u> at 720-21.

**IV.  THE EVALUATION OF DISABILITY**

     People are "disabled" for purposes of receiving Social

Security benefits if they are unable to engage in any substantial

gainful activity owing to a physical or mental impairment that is

expected to result in death or has lasted, or is expected to

last, for a continuous period of at least 12 months.  42 U.S.C.

§ 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir.

1992).

     A.  <u>The Five-Step Evaluation Process</u>

     The ALJ follows a five-step sequential evaluation process in

assessing whether a claimant is disabled.  20 C.F.R.

§§ 404.1520(a)(4), 416.920(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821,

828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first

step, the Commissioner must determine whether the claimant is

currently engaged in substantial gainful activity; if so, the

claimant is not disabled and the claim must be denied.

§§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied.  §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[1] to perform his past work; if so, the claimant is not disabled and the claim must be denied.  §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  The claimant has the burden of proving he is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a prima facie case of disability is established.  Id.

If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that

---

[1]    RFC is what a claimant can do despite existing exertional and nonexertional limitations.  §§ 404.1545, 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

4

the claimant is not disabled because he can perform other substantial gainful work available in the national economy. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  That determination comprises the fifth and final step in the sequential analysis. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

    B.    The ALJ's Application of the Five-Step Process

        At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since September 26, 2009, his alleged onset date.  (AR 27.)  At step two, he found that Plaintiff had the severe impairments of hepatitis C, degenerative disc disease of the neck, left-shoulder impairment, and left-wrist impairment.  (Id.)  At step three, he determined that Plaintiff's impairments did not meet or equal any of the impairments in the Listing.  (AR 27-28.)  At step four, the ALJ found that Plaintiff had the RFC to perform light work[2] with limitations to "occasional postural activities, no overhead work with non-dominant left upper extremity, occasional fine/gross manipulation with left upper extremity and no unprotected heights or dangerous machinery."  (AR 28.)  Based on the VE's testimony, the ALJ concluded that Plaintiff was unable to perform his past relevant work but could perform jobs existing in significant numbers in the national economy.  (AR 32-34.)  Accordingly, he

_____

        [2]    "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  §§ 404.1567(b), 416.967(b).  "Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  Id.

found Plaintiff not disabled.  (AR 34.)

**V.   DISCUSSION**

Plaintiff contends that the ALJ erred in (1) formulating his RFC and (2) assessing his credibility.  (J. Stip. at 4.)

A.   The ALJ Properly Formulated Plaintiff's RFC

Plaintiff contends that in formulating his RFC, the ALJ erred by "rejecting the limitations on standing, walking, and sitting described by" treating physician Khalid B. Ahmed, "failing to weight the limitations on use of the left hand and arm described by" examining physician David E. Fisher, and "failing to consider the limitations in pushing and pulling described by" examining physician Dr. Vincente R. Bernabe.  (J. Stip. at 10.)

1.   Applicable law

A district court must uphold an ALJ's RFC assessment when the ALJ has applied the proper legal standard and substantial evidence in the record as a whole supports the decision.  Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005).  The ALJ must consider all the medical evidence in the record and "explain in [his] decision the weight given to . . . [the] opinions from treating sources, nontreating sources, and other nonexamining sources."  §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii); see also §§ 404.1545(a)(1) ("We will assess your residual functional capacity based on all the relevant evidence in your case record."), 416.945(a)(1); SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (same).  In making an RFC determination, the ALJ may consider those limitations for which there is support in the record and need not consider properly rejected evidence or

6

subjective complaints. <u>See</u> <u>Bayliss</u>, 427 F.3d at 1217 (upholding ALJ's RFC determination because "the ALJ took into account those limitations for which there was record support that did not depend on [claimant's] subjective complaints"); <u>Batson v. Comm'r of Soc. Sec. Admin.</u>, 359 F.3d 1190, 1197 (9th Cir. 2004) (ALJ not required to incorporate into RFC any findings from treating-physician opinions that were "permissibly discounted").  The Court must consider the ALJ's decision in the context of "the entire record as a whole," and if the "evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." <u>Ryan v. Comm'r of Soc. Sec.</u>, 528 F.3d 1194, 1198 (9th Cir. 2008) (internal quotation marks omitted).

Three types of physicians may offer opinions in Social Security cases: (1) those who directly treated the plaintiff, (2) those who examined but did not treat the plaintiff, and (3) those who did not treat or examine the plaintiff. <u>Lester</u>, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than that of an examining physician, and an examining physician's opinion is generally entitled to more weight than that of a nonexamining physician. <u>Id.</u>

This is true because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant. <u>Smolen v. Chater</u>, 80 F.3d 1273, 1285 (9th Cir. 1996). If a treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight. §§ 404.1527(c)(2), 416.927(c)(2).  If a treating physician's

7

opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors.   §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

When a treating or examining physician's opinion is not contradicted by other evidence in the record, it may be rejected only for "clear and convincing" reasons.   See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008) (quoting Lester, 81 F.3d at 830-31).   When a treating or examining physician's opinion is contradicted, the ALJ must provide only "specific and legitimate reasons" for discounting it.   Id.   The weight given an examining physician's opinion, moreover, depends on whether it is consistent with the record and accompanied by adequate explanation, among other things. §§ 404.1527(c)(3)-(6), 416.927(c)(3)-(6).

Furthermore, "[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings."   Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); accord Batson, 359 F.3d at 1195.

　　　　2.   Relevant background

On September 26, 2009, when Plaintiff was working as a roofer, he fell 15 feet from a roof and suffered fractures of the pelvis, left sacrum, upper left humerus, and lower left radius.[3]

---

[3]    The humerus is an upper arm bone and the radius is one of the lower arm bones.   Arm bones, Mayo Clinic, http://

(AR 340, see also AR 350-62.)  He was taken to the hospital, where surgery was performed the next day to repair the humerus and radius fractures.  (AR 368-69.)  The following day, he was discharged from the hospital with a prescription for pain medication.  (AR 338, 341.)

On March 19, 2010, Dr. Andrew S. Wong examined Plaintiff and completed a "Final Complex Orthopedic/Neurologic Report of Primary Treating Physician to Determine Issues of Permanent Disability" as part of Plaintiff's worker's-compensation case. (AR 371-75.)  Dr. Wong, who was board eligible in orthopedic surgery (AR 375), found that Plaintiff had "made a good recovery from a severe injury"; although he "continues to have some deficits from his injuries," his fractures were healed (AR 374). Plaintiff could "function in his daily activities with his current motion and strength" and had reached a state of "Maximum Medical Improvement."  (Id.)  Dr. Wong opined that Plaintiff's only work restriction was "no overhead work with the left arm." (Id.)

On May 28, 2010, Dr. Fisher, an orthopedic surgeon, examined Plaintiff, reviewed his medical records, and completed a "Qualified Medical Evaluation."[4]  (AR 528-40.)  Dr. Fisher diagnosed "[l]eft proximal humerus fracture status post open reduction/internal fixation"; "[l]eft distal radius intraarticular fracture, status post open reduction/internal

_____

www.mayoclinic.org/diseases-conditions/broken-arm/ multimedia/arm-bones/img-20007018 (last visited Feb. 3, 2015).

[4]   Dr. Fisher stated that he did not have a treatment relationship with Plaintiff.  (AR 529.)

fixation"; and "[c]ontusion, left low back." (AR 537-38.) Dr. Fisher did not believe that Plaintiff had reached maximum medical improvement. (AR 538.) He listed Plaintiff's objective factors of disability as tenderness in the trapezius[5] and scapular border on the left side, decreased range of motion in the left shoulder, and healed scars on the shoulder and lower arm. (Id.) Dr. Fisher believed that Plaintiff could perform modified duties, with no lifting or reaching with his "right arm or hand"[6] and "no climbing on uneven surfaces or walking at unprotected heights." (Id.)

On October 25, 2010, Dr. Fisher performed a "Qualified Medical Reevaluation," finding Plaintiff was "maximally medically improved." (AR 519-27.) He opined that Plaintiff could "perform modified duties with no lifting or reaching with his left arm or hand" and "no climbing on uneven surfaces or walking at unprotected heights." (AR 525.) Dr. Fisher attributed Plaintiff's limitations to "loss of range of motion in his left shoulder and left wrist." (Id.) On April 18, 2011, Dr. Fisher reviewed Plaintiff's December 2010 cervical-spine MRI and left-shoulder and -wrist x-rays and completed a supplemental report. (AR 516-18.) He noted that Plaintiff's cervical spine had spurring and disc protrusions but that they did "not appear to be significant enough to warrant surgical intervention." (AR 517.)

---

[5]     The trapezius is one of the muscles of the shoulder. See Stedman's Medical Dictionary 1158 (27th ed. 2000).

[6]     Dr. Fisher presumably intended this limitation to apply to Plaintiff's left arm and hand.

10

On September 23, 2011, a treating orthopedic surgeon, Dr. Ahmed, completed a one-page check-off "Permanent and Stationary Form." (AR 578; see also AR 440-41 (stating that Dr. Ahmed was board certified in orthopedic surgery).) Dr. Ahmed opined that Plaintiff was precluded from lifting more than 40 pounds, "forceful" pulling or squeezing, performing overhead work, standing or walking for more than one hour without a five-minute break, and sitting for more than one hour without a five-minute break. (Id.) On December 21, 2011, Dr. Ahmed completed a progress report, listing Plaintiff's diagnoses as "Cervical Strain, Disk Lesion with Radiculitis/Radiculopathy";[7] "Left Shoulder Open Reduction Internal Fixation, Left Proximal Humerus, with Retained Hardware, Plates and Screws"; "Adhesive Capsulitis,[8] Left Shoulder, Tendonitis, Impingement Syndrome,[9] Rotator Cuff Tear"; "Internal Derangement, Open Reduction Internal Fixation, Left Distal Radius with Retained Hardware, Plates, and Screws"; "Tendonitis, Carpal Tunnel Syndrome, Left Hand"; "Fracture, Left Side of Rib Cage"; "Lumbar Strain, Disk

---

[7] Radiculitis, or radiculopathy, is a disorder of the spinal nerve roots. See Stedman's Medical Dictionary 1503 (27th ed. 2000).

[8] Adhesive capsulitis, or "frozen shoulder," is a condition characterized by stiffness and pain in the shoulder joint. Frozen shoulder, Mayo Clinic, http://www.mayoclinic.org/ diseases-conditions/frozen-shoulder/basics/definition/con-20022510 (last updated April 28, 2011).

[9] Impingement syndrome occurs with impingement of tendons or bursa in the shoulder from bones of the shoulder. Shoulder Impingement Syndrome, WebMD, http://www.webmd.com/ osteoarthritis/guide/impingement-syndrome (last accessed Feb. 3, 2015).

11

Lesion of Lumbar Spine with Radiculitis/Radiculopathy"; and symptoms of anxiety, depression, and intermittent insomnia. (AR 438.)

On January 23, 2012, Dr. Fisher completed a supplemental report after reviewing additional medical records. (AR 510-15.) He noted that the new medical reports showed that Dr. Ahmed had performed cervical-spine facet blocks and a cervical-spine epidural catheter, but he found that those "reports in no way alter my opinion as stated regarding the issues of causation, apportionment, or treatment." (AR 513-14.)

On February 23, 2012, medical consultant G. Lockie, a pediatrician,[10] reviewed Plaintiff's medical records and opined that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk about six hours in an eight-hour day; sit for about six hours in an eight-hour day; perform unlimited pushing and pulling; frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and occasionally climb ladders, ropes, and scaffolds. (AR 65-66.) Dr. Lockie further opined that Plaintiff could only occasionally use his left upper extremity to reach overhead, handle, finger, or feel and that he must avoid unprotected heights and machinery. (AR 66-67.)

On October 2, 2012, Dr. Bernabe, a board-certified orthopedic surgeon, examined Plaintiff and completed an

---

[10]   Dr. Lockie's electronic signature includes a medical specialty code of 32, indicating pediatrics. (AR 64; see Program Operations Manual System (POMS) DI 26510.089, U.S. Soc. Sec. Admin. (Oct. 25, 2011), http://policy.ssa.gov/poms.nsf/lnx/0426510089; POMS DI 26510.090, U.S. Soc. Sec. Admin. (Aug. 29, 2012), http://policy.ssa.gov/poms.nsf/lnx/0426510090.

orthopedic consultation at the Social Security Administration's request. (AR 573-77.) Dr. Bernabe also reviewed Dr. Fisher's October 25, 2010 report and Plaintiff's August 2010 lumbar- and cervical-spine MRIs. (AR 573.) Dr. Bernabe diagnosed cervical and lumbar musculoligamentous strain, "[s]tatus post internal fixation of a left proximal humerus fracture with secondary adhesive capsulitis and residual impingement syndrome," "[s]tatus post internal fixation of left distal radius intraarticular fracture," and "De Quervain's tendinitis of the left wrist."[11] (AR 576-77.) Dr. Bernabe opined that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; walk and stand six hours in an eight-hour day; sit six hours in an eight-hour day; perform manipulative activities frequently with the left upper extremity and without limitation with the right upper extremity; and occasionally push, pull, walk on uneven terrain, climb ladders, work at heights, bend, crouch, stoop, and crawl. (Id.) Dr. Bernabe opined that an assistive device was "[n]ot medically necessary." (Id.)

On October 10, 2012, medical consultant Dr. Pamela Ombres[12] reviewed the medical evidence and found that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk about six hours in an eight-hour day; sit for about six

---

[11] De Quervain's tendinitis occurs when the tendons running from the back of the thumb down the side of the wrist are swollen and irritated. De Quervain tendinitis, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/patientinstructions/000537.htm (last updated May 15, 2014).

[12] The record does not reflect Dr. Ombres's area of specialization, if any. (See AR 90, 93-95.)

hours in an eight-hour day; perform unlimited pushing and
pulling; occasionally climb ramps, stairs, ladders, ropes, and
scaffolds; and occasionally balance, stoop, kneel, crouch, and
crawl.  (AR 93-94.)  She believed Plaintiff could occasionally
use his left upper extremity to reach overhead, handle, finger,
or feel and that he must avoid unprotected heights and machinery.
(AR 94-95.)

> ### 3.  Analysis

The ALJ found that Plaintiff had the RFC to perform "light
work," which involved lifting a maximum of 20 pounds and
frequently lifting and carrying up to 10 pounds, <u>see</u>
§§ 404.1567(b), 416.967(b), with additional limitations to
"occasional postural activities, no overhead work with non-
dominant left upper extremity, occasional fine/gross manipulation
with left upper extremity and no unprotected heights or dangerous
machinery."  (AR 28.)  In so finding, the ALJ summarized the
medical evidence and gave "great weight" to the opinions of Drs.
Wong, Bernabe, Lockie, and Ombres and "minimal weight" to the
opinions of Drs. Ahmed and Fisher.[13]  (AR 30-32.)  For the
reasons discussed below, the ALJ did not err in determining
Plaintiff's RFC.

Plaintiff contends that the ALJ failed to provide specific
and legitimate reasons for discounting Dr. Ahmed's opinion.  (J.
Stip. at 10.)  As an initial matter, at least some of the RFC
assessment was consistent with, or more restrictive than, Dr.

---

[13]   Plaintiff disputes that the ALJ assigned any specific
weight to Dr. Fisher's opinion. (J. Stip. at 7, 9.)  As explained
below, he is incorrect.

Ahmed's findings.  The ALJ found that Plaintiff was precluded from performing overhead work with his left arm (AR 28), which was partially consistent with Dr. Ahmed's finding that Plaintiff could not perform overhead work (AR 578).  Moreover, the ALJ found that Plaintiff could lift only 10 pounds frequently and a maximum 20 pounds (AR 28), which was considerably more restrictive than Dr. Ahmed's finding that Plaintiff could lift up to 40 pounds, apparently on an unlimited basis (see AR 578).

     Moreover, to the extent the ALJ rejected Dr. Ahmed's opinion, he gave specific and legitimate reasons for doing so. Dr. Ahmed opined that Plaintiff could not perform any overhead work or "forceful" pulling or squeezing, apparently with either arm (AR 578), but the ALJ correctly found that Plaintiff's "impairments do not affect his right side" and "there is no support for right sided upper extremity limitations" (AR 31; see also AR 438 (Dr. Ahmed's diagnoses of several left-extremity conditions but no right-extremity conditions), 371 (Dr. Wong's notation of Plaintiff's complaints of left-shoulder stiffness and weakness and "difficulty lifting heavy objects with his left arm"), 374 (Dr. Wong's diagnoses of left-arm conditions and no right-arm conditions)).

     The ALJ also correctly observed that Dr. Ahmed's standing, walking, and sitting limitations were unsupported because Plaintiff's lower extremities and gait were "unremarkable."  (AR 31.)  Indeed, Plaintiff's treating and examining doctors consistently found that Plaintiff had a normal gait, could walk on his heels and toes, and did not need an assistive device. (See, e.g., AR 373 (Dr. Wong's Mar. 2010 finding that Plaintiff

walked "without limp and without assistive device"), 537 (Dr.
Fisher's May 2010 finding that Plaintiff could "ambulate freely
without any assistive devices in the room, and was able to
ambulate in the toe, heel, and neutral gait"), 524 (Dr. Fisher's
Oct. 2010 finding that Plaintiff could "ambulate about the room
freely in the toe, heel, and neutral gait"), 575 (Dr. Bernabe's
Oct. 2012 finding that Plaintiff could walk on toes and heels,
had normal swing and stance phases, and did not need assistive
device).)  Plaintiff nevertheless contends that Dr. Ahmed's
standing, walking, and sitting restrictions are supported by Dr.
Bernabe's diagnoses of cervical and lumbar strain and his
examination findings of muscle spasm, reduced range of motion, a
two-centimeter difference in the circumference of Plaintiff's
thighs, and a one-centimeter difference in the circumference of
his calves.  (J. Stip. at 8-9.)  But as Plaintiff also
acknowledges, based on those and other examination findings, Dr.
Bernabe nevertheless opined that Plaintiff could stand and walk
six hours and sit six hours in an eight-hour day.  (AR 577.)  Dr.
Bernabe's opinion therefore does not support Dr. Ahmed's finding
of significant walking, standing, and sitting limitations.

     In any event, even if the ALJ had erred by not precluding
Plaintiff from performing "forceful" pushing and pulling or from
sitting, standing, or walking for more than an hour without a
five minute break (see AR 578), that error was harmless.  See
Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1055 (9th Cir.
2006) (nonprejudicial or irrelevant mistakes harmless).  The ALJ
ultimately found, based on the VE's testimony, that a person with
Plaintiff's RFC could perform three jobs existing in the national

16

economy: usher, which is light work, and table worker and bench hand, which are sedentary.  (<u>See</u> AR 33-34; <u>see also</u> AR 56.)  At the hearing, the ALJ asked the VE if a person would still be able to perform those jobs if he "required five minute breaks each hour"; the VE testified that the jobs "would still be able to be sustained."  (AR 57.)

Moreover, none of the three jobs appear to involve any pushing or pulling.  The usher job involves only "[a]ssist[ing] patrons at entertainment events to find seats, search for lost articles, and locate facilities, such as restrooms and telephones," "[d]istribut[ing] programs to patrons," and "[a]ssist[ing] other workers to change advertising display."  DOT 344.677-014, 1991 WL 672865.  The table-worker job involves "[e]xamin[ing] squares (tiles) of felt-based linoleum material passing along on conveyor and replac[ing] missing and substandard tile."  DOT 739.687-182, 1991 WL 680217.  And the bench-hand job involves only "[c]ut[ing], saw[ing], or break[ing] off gates from jewelry castings, using shears, jeweler's saw, pliers, or foot press equipped with cutting tool," "[r]emoving burrs and smooth[ing] rough edges of casting, using file or grinding wheel," "[s]traighten[ing] distorted castings, using foot press equipped with shaping dies," and possibly "dipping castings in water and acid solution" or "count[ing] and separat[ing] jewelry casting into containers."  DOT 700.687-062, 1991 WL 678937.  None of those responsibilities appear inconsistent with a preclusion from forceful pulling or grasping.

Plaintiff also contends that the ALJ gave "no reasons" for rejecting Dr. Fisher's opinion.  (J. Stip. at 9.)  But the ALJ

17

did not reject Dr. Fisher's finding that Plaintiff was precluded
from walking at protected heights; rather, he specifically
included such a limitation in Plaintiff's RFC. (See AR 28
(stating that Plaintiff could not work at "unprotected
heights").)  Moreover, the ALJ discussed Dr. Fisher's opinion and
examination findings in the same paragraph he discussed Dr.
Ahmed's, noting that Dr. Fisher found that Plaintiff "could not
lift or reach with his left arm or hand, could not climb on
uneven surfaces or walk at unprotected heights." (AR 30-31; see
also AR 525 (Dr. Fisher's opinion regarding Plaintiff's work
restrictions)).  The ALJ also correctly noted that Dr. Fisher
found during his examinations that Plaintiff's "gait was
unremarkable" and that he had "limited range of motion in his
shoulder and wrist but full range of motion in his cervical
spine," a "clinically strong" grip, and "no sensory loss in the
upper extremities." (AR 30; see AR 536 (May 2010 examination
findings of "full range of motion of his cervical spine," limited
range of motion of left shoulder and wrist, no sensory loss in
upper extremities, and "clinically strong" grip), 537 (May 2010
finding that Plaintiff could "ambulate freely without any
assistive devices in the room, and was able to ambulate in the
toe, heel, and neutral gait"), 523 (Oct. 2010 finding of limited
ranges of motion of shoulders and wrist), 524 (Oct. 2010 finding
that Plaintiff could "ambulate about the room freely in the toe,
heel, and neutral gait").)  At the end of the paragraph
summarizing Drs. Fisher's and Ahmed's opinions, the ALJ noted,
among other things, that "[t]hese limitations are given minimal
weight because they are not supported by [Plaintiff's]

1  examination findings." (AR 31.)  The most reasonable

2  interpretation is that in doing so, the ALJ referred to all of

3  the limitations and examination findings he discussed in that

4  paragraph, including Dr. Fisher's.

5       Moreover, that Dr. Fisher's opinion was inconsistent with

6  Plaintiff's examination findings was a permissible reason for

7  according it reduced weight.  See Thomas, 278 F.3d at 957.  Dr.

8  Fisher found that Plaintiff was precluded from any lifting or

9  reaching with his left arm or hand.  But as discussed, Dr. Fisher

10  found during his examinations that Plaintiff had limited range of

11  motion of the shoulder and wrist but a "clinically strong" grip

12  and no sensory loss.  Dr. Bernabe, moreover, examined Plaintiff

13  and similarly found that he had 4/5 motor strength in the left

14  upper extremity, 5/5 motor strength in all other extremities, and

15  "well preserved" sensation.  (AR 576.)  Dr. Bernabe concluded

16  that Plaintiff could lift and carry 20 pounds occasionally and 10

17  pounds frequently, and he found no limitations on Plaintiff's

18  ability to reach.  (AR 577.)  Moreover, Dr. Wong found that

19  Plaintiff had reduced range of motion in the left shoulder but

20  4/5 strength in two of his left rotator-cuff muscles and 5/5

21  strength in a third, with full range of motion of the lower back.

22  (AR 372-73.)  Dr. Wong believed that Plaintiff's only functional

23  limitation was "no overhead work with the left arm."  (AR 374.)

24  Based on those findings, the ALJ reasonably discounted Dr.

25  Fisher's opinion that Plaintiff was totally precluded from using

26  his left arm for any lifting or reaching, particularly given that

27  Plaintiff's RFC for light work involved lifting very little

28  weight.

19

In formulating Plaintiff's RFC, the ALJ was entitled to rely on the opinions of Drs. Wong, Bernabe, Lockie, and Ombres instead of those of Drs. Ahmed and Fisher.  The ALJ permissibly credited Dr. Wong's opinion because he was Plaintiff's treating physician and his opinion was supported by his examination findings.  (See AR 30); §§ 404.1527(c)(2) (more weight generally given opinion from treating source), 416.927(c) (same); §§ 404.1527(c)(3) (more weight given opinion supported by objective findings), 416.927(c)(3) (same).  Dr. Bernabe's opinion also constituted substantial evidence supporting the RFC assessment because it was based on his own independent clinical findings.  See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (finding that examining physician's "opinion alone constitutes substantial evidence" supporting RFC assessment "because it rests on his own independent examination of" claimant); Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (when "opinion of a nontreating source is based on independent clinical findings," it "may itself be substantial evidence").  Drs. Wong's and Bernabe's opinions could also reasonably be credited because they both specialized in orthopedic surgery (see AR 375, 577); §§ 404.1527(c)(5) (more weight given to opinion from specialist about medical issues related to area of specialty), 416.927(c)(5) (same), and Dr. Bernabe also reviewed some of Plaintiff's medical records before rendering his opinion (see AR 573); §§ 404.1527(c)(3) (in weighing medical opinions, ALJ "will evaluate the degree to which these opinions consider all of the pertinent evidence in [claimant's] claim"), 416.927(c)(3) (same).

Drs. Lockie's and Ombres's opinions, moreover, were largely

1  consistent Drs. Bernabe's and Wong's findings.  (See AR 63-67,
2  89-90, 93-95); Thomas, 278 F.3d at 957 ("The opinions of
3  non-treating or non-examining physicians may also serve as
4  substantial evidence when the opinions are consistent with
5  independent clinical findings or other evidence in the record.").
6  And both consulting doctors reviewed all the evidence in
7  Plaintiff's file at the time of their assessments.  (See AR 63-
8  67, 89-90, 93-95); §§ 404.1527(c)(3), 416.927(c)(3).  Thus, any
9  conflict in the properly supported medical-opinion evidence was
10  "solely the province of the ALJ to resolve."  Andrews, 53 F.3d at
11  1041.

12     Finally, to the extent Plaintiff argues that the ALJ erred
13  by omitting from the RFC Dr. Bernabe's limitation to occasional
14  pushing and pulling (J. Stip. at 9-10; see also AR 577), reversal
15  is not warranted.  As previously discussed, none of the jobs the
16  ALJ found Plaintiff could perform appear to involve pushing and
17  pulling.  Thus, even if the ALJ erred by failing to include that
18  limitation in the RFC, it was harmless.  See Stout, 454 F.3d at
19  1055 (nonprejudicial or irrelevant mistakes harmless).

20     Because the ALJ's RFC assessment was supported by
21  substantial evidence, remand is not warranted.  See Young v.
22  Comm'r of Soc. Sec., __ F. App'x __, 2014 WL 6845867, at *1 (9th
23  Cir. Dec. 5, 2014) (finding RFC supported by substantial evidence
24  in part because it was consistent with opinions of examining and
25  consulting medical sources); Larsen v. Comm'r Soc. Sec. Admin.,
26  585 F. App'x 484, 485 (9th Cir. 2014) (substantial evidence
27  supported RFC when doctors' opinions "supported the ALJ's
28  determination").

B.    The ALJ Properly Assessed Plaintiff's Credibility

Plaintiff contends that the ALJ "failed to articulate legally sufficient reasons for rejecting" his subjective symptom testimony.  (J. Stip. at 22.)

1.    Applicable law

An ALJ's assessment of symptom severity and claimant credibility is entitled to "great weight."  See Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)."  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (internal quotation marks omitted).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis.  See Lingenfelter, 504 F.3d at 1035-36.  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged."  Id. at 1036 (internal quotation marks omitted).  If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged."  Smolen, 80 F.3d at 1282 (emphasis in original).

Second, if the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion.  See Berry

22

1  v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent a finding
2  or affirmative evidence of malingering, the ALJ must provide
3  "clear and convincing" reasons for rejecting the claimant's
4  testimony.  Lester, 81 F.3d at 834; Ghanim v. Colvin, 763 F.3d
5  1154, 1163 & n.9 (9th Cir. 2014).

6       In assessing a claimant's credibility, the ALJ may consider
7  (1) ordinary techniques of credibility evaluation, such as the
8  claimant's reputation for lying, prior inconsistent statements,
9  and other testimony by the claimant that appears less than
10 candid; (2) unexplained or inadequately explained failure to seek
11 treatment or to follow a prescribed course of treatment; (3) the
12 claimant's daily activities; (4) the claimant's work record; and
13 (5) testimony from physicians and third parties.  Thomas, 278
14 F.3d at 958-59; Smolen, 80 F.3d at 1284.  If the ALJ's
15 credibility finding is supported by substantial evidence in the
16 record, the reviewing court "may not engage in second-guessing."
17 Thomas, 278 F.3d at 959.

18          2.  Relevant background
19     In an undated disability report, Plaintiff wrote that he was
20 unable to work because of "[b]roken arm, disc, neck, hip, [and]
21 rib problem."  (AR 247.)  In an August 29, 2012 function report,
22 Plaintiff stated that he slept all day and got up only to go to
23 doctor's appointments.  (AR 287.)  He did not take care of
24 anyone; his wife cared for their four children and cat.  (AR
25 288.)  Plaintiff could not scrub his own back and needed his wife
26 to help him.  (Id.)  He prepared sandwiches and frozen dinners
27 rarely and only when his wife was not available to make his
28 meals.  (AR 289.)  Plaintiff took out the trash each week and

23

could perform "simple" home repairs "with help." (Id.)  He
rarely went grocery shopping, and his wife handled the bills.
(AR 290.)  He could not drive because of his back pain,
headaches, and "stress." (Id.)  Plaintiff called his mother on
the phone and sometimes attended church. (AR 291.)  He rarely
visited other people and rarely attended his son's soccer games
or practices. (Id.)

Plaintiff reported that he could not lift more than 30 or 40
pounds and could not "reach out." (AR 292.)  Squatting, walking,
standing, bending, and climbing stairs "tire[d] [him] easily" and
made his "bones ache." (Id.)  His "memory and concentration"
were "not good," and he could pay attention for "30 minutes or
less." (Id.)  He could walk one block before needing to rest for
five minutes. (Id.)  Plaintiff wrote that he used a cane when
walking, a back brace when taking out the trash or doing other
chores, and a wrist brace "all the time." (AR 293.)

In a March 2012 disability report, Plaintiff stated that he
was "very forgetful" and had memory loss, "lots of pain in neck,
back, arms, [and] legs," and "severe headaches." (AR 263, 268.)
He had problems scrubbing his back in the shower, and his back
hurt when bending over to tie his shoes. (AR 267.)  In a later
disability report, Plaintiff wrote that since October 2012, his
pain had worsened, walking "tire[d] [him] easily," and he had
"pain in legs and back." (AR 297.)  He wrote that since
completing his March 2012 disability report, he had become
forgetful and developed anxiety and depression. (Id.)

At the May 2013 hearing, Plaintiff testified that he could
not work because of pain in his "bones," head, neck, and back.

(AR 45.)   He took three hydrocodone a day for pain.  (AR 46.)

Plaintiff was receiving treatment for hepatitis C, and because of

that condition, he sometimes felt like vomiting "and blood [came]

out" of his stomach.  (AR 47.)  Plaintiff testified that he had

that problem "[s]ometimes daily or sometimes the last three days

[sic]."  (Id.)  He had to get out of bed after two hours of sleep

to "walk a little bit because [his] knee starts to hurt and [his]

back."  (AR 48.)

        Plaintiff testified that he had never had a driver's license

and did not take his children to school.  (AR 49.)  He went

grocery shopping with his wife but could not walk for long and

used "a little cart that they lend you there."  (AR 49-50.)   He

attended church on Sundays but sat in the back because he needed

to get up and walk during the service.  (AR 50.)  He could not

help his four sons with their homework because he was "not able

to concentrate" and got headaches that made him "go blind."  (AR

52.)  Plaintiff testified that he could sit or stand 10 or 20

minutes before needing to lie down.  (AR 51.)  He could not bend

or sit for 20 minutes (AR 45), and he had headaches daily (AR 51-

52).

                3.   Analysis

        The ALJ found that Plaintiff's "medically determinable

impairments could reasonably be expected to cause some of the

alleged symptoms" but that his "statements concerning the

intensity, persistence and limiting effects of these symptoms are

not credible to the extent they are inconsistent with" his RFC.

(AR 29.)  As discussed below, the ALJ gave several clear and

convincing reasons, supported by substantial evidence, for

                                25

discounting Plaintiff's credibility.

The ALJ permissibly discounted Plaintiff's credibility based
on his inconsistent statements regarding his symptoms and
activities.  (AR 28 (noting various specific inconsistencies));
see Smolen, 80 F.3d at 1284 (in assessing credibility, ALJ may
consider "ordinary techniques of credibility evaluation," such as
prior inconsistent statements and "other testimony by the
claimant that appears less than candid").  For example, in August
2012, Plaintiff reported that he did not take care of anyone, his
wife took care of the children, he "rarely" visited people, he no
longer took walks, and his only household chores were to take out
the trash weekly and perform "simple" home repairs "with help"
(AR 288-89, 291); similarly, at the May 2013 hearing, he
testified that he did not take his children to school (AR 49) and
could sleep for only two hours at a time before needing to get up
to walk around (AR 48-49).  But as the ALJ found (AR 28), in
September 2011, Plaintiff reported to a psychiatrist that his
sleep was "fine" and "that he gets his children ready for school,
takes them to school, does some light household chores, picks
them up from school, is able to do his activities of daily
living, walks and visits with his father."  (AR 28; see AR
410).)[14]  Although Plaintiff now argues that the differences in
his reported activities are attributable to his starting
hepatitis C treatment sometime around July 2012 (J. Stip. at 31;

---

[14]    Plaintiff also reported to the psychiatrist that his
license had once been suspended because he did not take care of a
ticket (AR 411), which conflicted with his hearing testimony that
he had never had a driver's license (AR 49).

1  see also AR 563-66), in the August 2012 function report he did
2  not attribute any limitations to his hepatitis C treatment;
3  rather, he cited pain in his "hands, back, arms, legs,"
4  "backache," "tir[ing] easily," "headaches," and "stress" (AR 289-
5  91).   That same month, Plaintiff's medical provider noted that
6  Plaintiff's hepatitis-treatment side effects were "moderate and
7  tolerable."  (AR 562.)  Moreover, Plaintiff's hepatitis treatment
8  was temporary, not indefinite (AR 562-63), and he points to
9  nothing else in the record that could cause a worsening of his
10 symptoms.   In sum, Plaintiff's inconsistent statements undermined
11 the credibility of his subjective complaints.

12     The ALJ also discounted Plaintiff's credibility because he
13 "came to the hearing wearing a left wrist brace, back brace and
14 using a cane," but his "physical examination findings do not
15 establish the need for such devices."  (AR 29.)   Indeed, although
16 Plaintiff was instructed to wear a wrist splint for two weeks
17 after his September 2009 surgery and was then provided a
18 removable brace (see AR 368, 389), nothing indicates that he
19 needed to continue to use it for years thereafter.   Moreover,
20 none of Plaintiff's treating or examining physicians opined that
21 Plaintiff needed to use a cane; to the contrary, they regularly
22 observed that he had a normal gait and could walk without an
23 assistive device.  (See AR 373 (Dr. Wong's Mar. 2010 finding that
24 Plaintiff walked "without limp and without assistive device"),
25 537 (Dr. Fisher's May 2010 finding that Plaintiff could "ambulate
26 freely without any assistive devices in the room, and was able to
27 ambulate in the toe, heel, and neutral gait"), 524 (Dr. Fisher's
28 Oct. 2010 finding that Plaintiff could "ambulate about the room

freely in the toe, heel, and neutral gait"), 526 (Dr. Fisher's
Oct. 2010 notation that Plaintiff "has no gait alteration"), 575
(Dr. Bernabe's Oct. 2012 finding that Plaintiff could "walk
unassisted" and on his toes and heels and had "normal swing and
stance phases").)  Dr. Bernabe, moreover, specifically found that
Plaintiff "uses a cane but an assistive device is not medically
necessary."  (AR 575; see also AR 577.)  The ALJ was entitled to
discount Plaintiff's credibility based on his use of a wrist
brace and cane at the hearing.  See Verduzco v. Apfel, 188 F.3d
1087, 1090 (9th Cir. 1999) (ALJ properly discounted credibility
when claimant "walked slowly and used a cane at the hearing" even
though no doctor indicated he used or needed assistive device and
two doctors noted he did not need one).

     The ALJ may have erroneously found that Plaintiff's records
did not establish he needed a back brace (AR 29), however,
because it appears that in January 2011, Dr. Ahmed recommended
that he use a lumbosacral brace for support (AR 459 (recommending
"LSO brace for support"); see also AR 506 (Apr. 2011 request for
"LSO brace for support")).  Although Plaintiff's need for such a
brace seems questionable given that a lumbar-spine MRI was normal
(see AR 475 (Dr. Ahmed's Sept. 2010 notation that lumbar-spine
MRI "came out to be negative")) and an x-ray showed only "mild
degenerative changes" (AR 579 (Mar. 2013 x-ray report)), given
Dr. Ahmed's explicit recommendation, the ALJ's discounting of
Plaintiff's credibility based on the use of a back brace at the
hearing may have been improper.  Any error was harmless, however,
because the ALJ's other credibility findings, including those
based on Plaintiff's use of a cane and wrist brace, were proper

and supported by substantial evidence.  See Carmickle, 533 F.3d
at 1163 (ALJ's errors harmless when they did not "negate the
validity" of adverse credibility determination (internal
quotation marks omitted)).

Finally, the ALJ permissibly discounted Plaintiff's
subjective complaints because they were inconsistent with the
medical evidence.  (AR 29.)  The ALJ found that Plaintiff "has
been examined by multiple medical doctors opining he is able to
perform a greater capacity of work activity than what the
claimant alleges he is limited to."  (AR 29.)  Indeed, Plaintiff
alleged that his medical impairments were so disabling that, for
example, he slept all day and got up only to go to doctor's
appointments (AR 287), could walk only one block before needing
to rest for five minutes (AR 292), and could sit or stand only 10
or 20 minutes before needing to lie down (AR 51).  But none of
the doctors who rendered opinions found that Plaintiff was so
limited.  Rather, Drs. Wong and Fisher placed no limits on
Plaintiff's ability to stand, sit, or walk at regular heights (AR
374, 525); Drs. Bernabe, Lockie, and Ombres found that Plaintiff
could stand and walk for six hours and sit for six hours in an
eight-hour day (AR 66, 93, 577); and Dr. Ahmed found that
Plaintiff could stand and walk for up to an hour or sit for up to
an hour before needing a five-minute break (AR 578).

The ALJ also noted that Plaintiff's treatment records did
not support the alleged "frequency or severity" of his hepatitis
C symptoms.  (AR 29.)  At the hearing, Plaintiff testified that
his hepatitis made him "feel like vomiting and blood comes out"
of his stomach, which happened "[s]ometimes daily or sometimes

the last three days [sic]." (AR 47.) But before starting antiviral treatment for his hepatitis C, Plaintiff reported that he "fe[lt] well" and had no complaints. (AR 566.) After starting treatment, sometime around July 2012, Plaintiff complained of nausea and other side effects (see, e.g., 564 (July 2012, noting that Plaintiff "feels tired, sick" and vomited after "4 injections")), but they seemed to improve with medication (see AR 563 (Aug. 7, 2012, noting that Plaintiff's nausea better with medication, no vomiting)). By the end of August 2012, moreover, Plaintiff still complained of fatigue and persistent nausea, but his side effects were noted to be "moderate and tolerable." (AR 562.) As such, substantial evidence supports the ALJ's finding that Plaintiff's medical records undermined the credibility of his claims concerning hepatitis-treatment symptoms.[15]

The ALJ also correctly noted that Plaintiff claimed to have daily headaches but "has had various examinations wherein he did not report problems with headaches." (AR 29.) Indeed, although Plaintiff claimed that daily headaches made him "go blind" (AR 51-52), most of his progress notes do not reflect any complaints of headaches (compare AR 481-83 (Dr. Ahmed's July 2010 report stating that Plaintiff suffered from headaches) with AR 562-64, 567 (June, July & Aug. 2012 treatment notes not mentioning

_____

[15] Even if Plaintiff's hepatitis treatment had rendered him unable to work, it was scheduled to last only 48 weeks and therefore would not have met the durational requirement for a disability. (See AR 562-63); 42 U.S.C. § 423(d)(1)(A) (defining "disability" as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months"); accord Drouin, 966 F.2d at 1257.

headaches), 566 (June 2012 treatment note stating that Plaintiff "feels well" and had no complaints), 583 (Mar. 2013 progress note not mentioning headaches), 587 (Oct. 2012 progress note not mentioning headaches), 586 (Jan. 2013 progress note showing negative sign next to words "headache today"), 590 (health-history form in which "Frequent Headaches" not checked under "medical history" or "present or recent concerns" sections), 581 (Apr. 2013 letter from treating nurse practitioner listing diagnosed and treated conditions, which did not include headaches).)[16]  Such conflicts with the medical evidence are permissible reasons for discounting Plaintiff's credibility.  See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis."); Carmickle, 533 F.3d at 1161 ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."); Lingenfelter, 504 F.3d at 1040 (in determining credibility, ALJ may consider "whether the alleged symptoms are consistent with the medical evidence").

     In sum, the ALJ provided clear and convincing reasons for discrediting Plaintiff's subjective complaints.  Because those

---

[16]     Plaintiff contends that the ALJ "stated that the record did not contain references to headaches" (J. Stip. at 20), but as noted above, the ALJ actually found that Plaintiff "has had various examinations wherein he did not report problems with headaches" (AR 29), not that Plaintiff never reported them.  Indeed, given that Plaintiff claimed he had headaches daily and they made him "go blind" (AR 51-52), one would reasonably expect him to regularly report his headaches to his treating sources.

1   findings were supported by substantial evidence, this Court may

2   not engage in second-guessing.  See Thomas, 278 F.3d at 959.

3   Plaintiff is not entitled to remand on this ground.

4   **VI.   CONCLUSION**

5        Consistent with the foregoing, and pursuant to sentence four

6   of 42 U.S.C. § 405(g),[17] IT IS ORDERED that judgment be entered

7   AFFIRMING the decision of the Commissioner and dismissing this

8   action with prejudice.  IT IS FURTHER ORDERED that the Clerk

9   serve copies of this Order and the Judgment on counsel for both

10  parties.

11

12

13  DATED: February 11, 2015          _____

14                                    JEAN ROSENBLUTH
                                      U.S. Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25  _____

26       [17]   This sentence provides: "The [district] court shall have
27  power to enter, upon the pleadings and transcript of the record, a
    judgment affirming, modifying, or reversing the decision of the
28  Commissioner of Social Security, with or without remanding the
    cause for a rehearing."

                                      32